STARNES & MOSLEY, *vs.* W. S. NEWSOM & others.

April Term, 1873

JURISDICTION—SPECIFIC PERFORMANCE—DAMAGES.—Chancery has no jurisdiction to enforce the specific execution of a contract to cultivate a particular crop in a designated mode, and to cut, cure, and deliver it in a certain prescribed manner; nor to estimate damages for its breach.

SAME, AGREEMENT.—The specific execution of contracts rests in discretion, and the court will never execute a hard and unconscionable bargain, nor any agreement not certain, fair, and just, nor where performance has become impossible, or would be inequitable.

SAME, WAIVER OF OBJECTION.—The waiver of objection to the jurisdiction of the court by the filing of an answer under the Code, § 4321, only estops the defendant from insisting upon the want of jurisdiction, and does not preclude the court from refusing to act in a case clearly unfit for investigation in equity.

*Atha Thomas*, for complainants.

*J. C. Gaut*, for defendants.

Bill and cross-bill for specific performance of a contract and damages for non-performance.

THE CHANCELLOR :—On the 18th of November, 1870, the contract in question was entered into by Samuel E. Hare of the one part, and Wm. S. Newsom and Charles F. Brown of the other part.

The contract recites that whereas Hare has been the lessee of a certain farm for four years, on which he now has forty thousand bunches of garden sage in a high state of cultivation, and whereas Brown & Newsom have leased the said farm for not less than two, nor more than four years, and have made this contract with Hare for the forty thousand bunches of sage, as follows : "We are to take charge of said sage as it now stands in the field, and subdivide the bunches as nearly equal as we can, so as to make one hundred and twenty thousand bunches, and transplant the same on twelve acres of good and well manured soil, so as to plant on each acre ten thousand bunches, and we are to keep the amount of ten thousand bunches to the acre during the specified time we cultivate the farm, for two or four years, say 1871-2-3-4, and will follow the instructions of said Samuel E. Hare in cultivating, cutting and curing the same as fol-

lows: We will plant the sets deep in the ground so as the top of the sets will be two inches from the level out of the ground, or as near on a level with the surface as possible, cultivate the same during the year to keep the grass and weeds out; we will then cut and gather the same four times a year, say in the light of the moon in May, July, September and October, and November in each and every year. We will cut and gather the same, clear and clean of dust and dirt, dry and cure the same in good merchantable order, and deliver all of the same to the said Samuel E. Hare in the city of Nashville, at any house he may select, on or before the 25th day of November in each and every year; and the said Newsom & Brown, at the expiration of their lease of said farm, bind themselves jointly and severally, their heirs, and representatives in a bond of ten thousand dollars to carry on this contract faithfully, and to deliver to the said S. E. Hare, at expiration of our lease, all of the hundred and twenty thousand bunches of garden sage, by giving him sixty days notice of our intention, and when this contract is faithfully carried out by us, it is to be null and void. And the said S. E. Hare, on his part, for the services rendered and performed as above stated, has agreed to pay to the said Newsom & Brown one hundred dollars per acre for every acre they cut and deliver according to contract, binding himself if failing to pay according to this contract when the sage is delivered, to forfeit all the green sage bunches until the contract is complied with on his part."

On the 24th of November, 1871, a supplement to this contract was entered into by the parties in writing, in which it was agreed that the first cutting of the sage should be in July, and that at all the cuttings the sage should be cut within three inches of the ground, and that the risk of damage by fire or water after the sage was stored should be borne by Hare.

Upon this contract Hare paid Newsom & Brown in advance $496 in horses, plows and other property, and Newsom & Brown early in February, 1871, took possession of the twelve

acres of land, and proceded to transplant the sage, and execute the contract.

The season proved to be a very dry one, and there was only one cutting of sage made in 1871, and that in July. The sage was permitted to grow up in grass, at first because it would prevent the soiling of the sage at the first cutting, and afterwards on account of the drouth. The sage that was cut was not delivered at the place designated because, upon inquiry, it was found that no provision had been made for payment of the rent on such delivery.

On the 7th of June, 1871, Hare assigned his interest in the contract to complainants. And on the 6th of July, 1871, Brown assigned his interest to the defendant Glasgow. The parties to the assignments seem to have recognized each other as taking the shoes of their assignors respectively.

On the 13th of January, 1872, the original bill was filed to compel the defendants to execute the contract, and for damages for non-compliance, and the crop of sage cut was attached. On the 28th of June, 1872, an amended bill was filed, alleging that the contract had been violated in transplanting and cultivating the sage, that many of the plants had died by reason of the treatment given, and that the defendants had, since the filing of the original bill, "dug up, removed and totally destroyed all of said sage bunches," both the original and increase bunches, and this without the knowledge of complainants.

The defendants, on the 24th of January, 1872, filed their answer to the original bill, which they made a cross-bill under which they claimed damages against complainants for failing to comply with the contract by the payment of rent. To this cross-bill one Atha Thomas was made a defendant as a partner of complainants, but this was, it is conceded, a mistake, and no relief is asked against him.

On the 1st of October, 1872, the defendants filed their answer to the amended bill, admitting that they had dug up and destroyed the sage bunches, claiming the right to do so because they were forfeited to them, by the failure to pay rent, according to the terms of the contract.     16

The original complainants answered the cross-bill, and proof has been taken on both sides.

The crop of sage raised in 1871 was attached in the cause, and sold under order of the court, and the net funds after paying cost of sale, amounting to $81.08 were paid into court, for the benefit of whom it might concern.

The evidence, consisting principally of the testimony of the parties themselves, shows clearly that there was not a strict compliance on the part of the defendants with the stipulations of the contract, either in the division of the bunches of sage, the covering therewith of twelve acres, the cultivation of the sage, the cutting or the delivery. The defendants claim, however, that the breach of the contract in the division of the bunches, &c., was waived by acquiesence, that the failure to keep down the grass was the fault of Hare and complainants, whose duty it was, they say, to give instructions, and of the season; that the four cuttings were rendered impossible by drouth, without destroying the crop; and that the failure to deliver was excused by the fact that no provision was made for payment of rent on delivery.

The contract, when it comes to be examined, is the most completely "heads I win, tails you lose" contract that can well be imagined. It is altogether one-sided. It admits the existence of forty thousand bunches of sage, and expressly binds the defendants to take these bunches "as they stand," and subdivide them, as nearly equal as they can, so as to make 120,000 bunches, to transplant the same on to twelve acres of land, "so as to plant on each acre ten thousand bunches," and to keep up this number of bunches during the specified time, which time, however, may be either two or four years at the option of the defendants. The defendants are mistaken in thinking that it was the duty of Hare or his assignees to give them instructions in cultivating the crop, and that they can charge upon complainants any loss by reason of their failure to give instructions. The contract does stipulate that the defendants are to "follow the instructions of the said Samuel E. Hare in cultivating, cutting,

and curing the" crop, but not instructions outside of the contract and during the progress of raising the crop. The contract stipulates as to what instructions are meant, by expressly designating them after the words "as follows," used immediately after the clause just quoted. The instructions of Hare, which they are to follow, are as follows: "we will plant the sets deep in the ground," &c. The defendants are, also, mistaken in supposing that, under the contract, they could demand payment of the rent upon the delivery of the single cutting made in 1871. It is very doubtful whether they could demand such payment, under any circumstances, the provision for the forfeiture of the green sage bunches "until the contract" in this respect is complied with by Hare, probably operating to give them a lien on the growing sage, if Hare should for any reason fail to pay on delivery. Be this as it may, it is certain that the defendants could not, under the terms of the contract, demand such rent, unless they had complied with their agreement, as to cultivating, cutting, and curing the sage. The contract is expressly that Hare is to pay the rent of $100 per acre "for every acre cut, cured, and delivered according to contract." The cutting "according to contract" was to be made four times each year "in the light of the moon" in July, September, October, and November. It is admitted by the defendants that there was only one cutting in 1871, and that one, so far as appears, not made "in the light of the moon." If they could claim $100 rent per acre for only one cuting, they could claim it for no cutting at all, if the season proved disastrous, or the crop was destroyed in any way. But, whatever may have been the intention of the defendants, it is not "so nominated in the bond." They have made no provision for bad seasons, and the courts can make none for them. They stipulate for $100 per acre rent for four cuttings of a well-cultivated crop of sage, and they cannot claim rent for any less. They have blindly put themselves in the power of the obligee in the bond, and if he prove a Shylock and demand the "pound of flesh," they are at his

mercy, unless the court can, with the wisdom of a Portia, while conceding the construction as claimed, turn the letter of the contract into a weapon of offence. And this the court feels itself authorized to do, under the circumstances in this case. The complainants have furnished me with no authorities, nor any argument, tending to show that they are entitled to come into this court for the specific execution of any such contract as the one now before the court. This court has, in some cases, undertaken to compel parties to carry out contracts of partnership in particular kinds of business, and sometimes to run a business under its orders. But I am not aware that it has ever been undertaken in a case like this, where the business is that of cultivating a particular crop in a particular manner, and by particular individuals. Nor am I aware of any law which authorizes a resort to this court, in the first instance, for the ascertainment of damages which the parties may choose to think they have sustained by reason of the breach of such a contract. The remedy is peculiarly and pre-eminently in a court of law, and before a jury.2 Story Eq. Jur., § 794.

And even if there were some law to justify the filing of the original bill, the question of specific performance is always one resting in the sound discretion of the court. Story Eq. Jur., § 742, 769. An agreement to be entitled to a specific performance ought to be certain, fair and just in all its parts. *Brashier* v. *Gratz*, 6 Wheat. 528; *Seymour* v. *Delancey*, 6 Johns. Ch. 222; *Hartnett* v. *Fielding*, 2 Sch. & Lef. 554. Courts will never decree such performance of hard and unconscionable bargains, *Gasgal* v. *Small*, 2 Strob. Eq. 72; where a performance has become impossible, or generally where such a decree would be inequitable under all the circumstances. *King* v. *Hamilton*, 4 Pet. 311; *Cathcart* v. *Robinson*, 5 Pet. 264; *Hudson* v. *King* 2 Heisk. 560, 574; *McCarty* v. *Kyle*, 4 Cold. 349. Nor will this court, as a general rule, entertain a bill for damages, where there is a perfect and complete remedy at law. It is far better that the damages should be assessed by a jury, than by an equity judge. Story Eq. Jur., § 794, and cases cited.

It is true that no objection has been made in this case by the defendants to the jurisdiction of the court. In the absence of such objection, it is ordinarily the duty of the court to determine the matters in controversy on the merits, under the Code, § 4321. But it was held by the supreme court, in *Lowe* v. *Morris*, 4 Sneed 69, under the act of 1852, 365, 9, from which this provision of the Code is taken, "that all that this legislation intended was, if the parties proceed to a hearing on bill, answer and proof, to silence the defendant from insisting on the want of jurisdiction." So, in *Stockley* v. *Rowley*, 2 Head 493, it was held that the objection to jurisdiction is, by such a course, waived " *at least in all cases not unfit for the investigation of equity.*" These decisions are manifestly correct. I agree that unless there are peculiar circumstances parties ought not to be turned out of court, where they have proceeded to a final hearing, without a decision on the merits. Such circumstances do exist in this case. The object of the original bill is to enforce a hard and inequitable bargain, which this court cannot do without violating one of its fundamental maxims. Nor can it give the defendants any relief under their cross-bill without taking cognizance of the complainant's case.

The fund in court will be applied to the payment of costs, and any surplus paid over to the defendants. The original and cross-bills will both be dismissed without prejudice to the rights of the parties, and any excess of costs over the fund in court will be borne equally by each party.